**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

HELEN TOBIA,

Plaintiff,

v.

LAKEWOOD BOARD OF EDUCATION, ET AL.,

Defendants.

Civil Action No. 3:16-cv-04850-FLW-DEA

**OPINION**

**WOLFSON, Chief Judge**:

This matter arises out of an employment dispute between Plaintiff Helen Tobia ("Plaintiff" or "Tobia") and Lakewood Board of Education ("Lakewood"). Plaintiff sues Lakewood, various Lakewood board members, and State Monitor Michael Azzara (collectively, "Defendants"), alleging that Defendants brought baseless tenure charges against her because she voiced concerns over what she believed to be illegal conduct. An independent arbitrator sustained Defendants' charges following four days of hearings. The New Jersey Superior Court, Appellate Division, affirmed the arbitrator's decision. *See Tobia v. Bd. of Educ. of Lakewood Twp*., No. A-5336, 2018 WL 1247426 (N.J. Super. Ct. App. Div. Mar. 12, 2018). Defendants now move to dismiss[1] Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and on collateral estoppel grounds. For the reasons below, Defendants' motion is **GRANTED** in part and **DENIED** in part as follows: collateral estoppel bars Plaintiff's First Amendment, Equal Protection, public policy,

---

[1]   Azzara is represented by his own counsel and has moved separately to dismiss Plaintiff's Complaint against him. However, since he and the other defendants have joined each other's motions, for the purposes of this opinion, I will consider the motions collectively.

LAD, and emotional distress claims; and Plaintiff fails to plead a plausible due process violation. As such, those claims are dismissed. However, I decline to exercise supplemental jurisdiction over Plaintiff's breach of contract, good faith and fair dealing claims in Counts Three and Four; they are dismissed without prejudice, and the any applicable statute of limitations is tolled pursuant to 28 U.S.C. § 1367(d), such that Plaintiff may refile these claims in state court within thirty days of date of the Order accompanying this Opinion.

## I.     FACTUAL AND PROCEDURAL HISTORY

Hired as a part-time special education teacher, Tobia worked for Lakewood from 1994 to 2015, when she was fired as Supervisor of Special Education. She attained tenure in 1998. *See* Compl., ¶¶ 2-4, 22, 25. Tobia alleges that Lakewood asked her to take various illegal actions between 2011 and 2015, and that Lakewood retaliated against her for refusing to do so. The alleged requested actions include: preventing disabled students from enrolling in the School for Children with Hidden Intelligence in violation of N.J.A.C. 6A:14; contracting with the Special Children's Center for $55,000 per student in violation of New Jersey Department of Education Guidelines regarding reimbursement; issuing a directive to enroll a Board member's daughter in a private school in violation of N.J.A.C. 6A:14; and signing a Needs Assessment Survey to certify the Special Children's Center as a licensed private school in the district when she believed the school was not qualified. *Id.* ¶¶ 27-33, 37-41, 73-81. Tobia also alleges that Lakewood attorney Michael Inzelbuch harassed her between October 2013 and January 2014, *id.* ¶¶ 46-54, and that Lakewood repeatedly reallocated state and federal funds to non-public schools in violation of state and federal law. *Id.* ¶¶ 43-45, 60-63, 82-87.

A. <u>The State Level Proceedings</u>

On August 7, 2015, Azzara charged Tobia with conduct unbecoming and inefficiency, and sought to terminate her for cause. *See* Compl. to Vacate Arbitration Award, ¶ 3.[2] Specifically, Azzara charged Tobia with (1) lying under oath, (2) willfully violating state and federal special education funding regulations, (3) directing that a student be deemed ineligible for special education services before a proper evaluation of the student, (4) making unilateral student placement decisions in non-eligible sectarian schools, (5) failure to work collaboratively with the District personnel, and (6) violating various district policies. *See* Arbitration Award, Ex. A., 29-104 (contention of Petitioner). Lakewood certified the charges later that month, and on October 15, 2015, the Commissioner for Education referred the charges to an arbitrator pursuant to the Tenure Employees Hearing Law. *See* N.J.S.A. 18A:6-10-18.1. Kathleen Duncan, Director of the Bureau of Controversies and Disputes, notified Tobia that she would be terminated if the charges proved true. *See* Compl. to Vacate Arbitration Award, ¶ 8.

Tobia and Lakewood appeared before the arbitrator four times between November and December 2015. *See* Arbitrator's Award, Ex. A., at 10. During these hearings, Tobia had counsel present, offered evidence, and cross-examined witnesses under oath. *Id.* The arbitrator sustained

---

2       The Court considers various extrinsic documents on this motion because they are integral to Plaintiff's Complaint, matters of public record, and otherwise indisputable. *See, e.g.*, *Lum v. Bank of America*, 361 F.3d 217, 221 n.3 (3d Cir. 2003) ("In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (explaining that a document forms the basis of a claim if the document is "integral to or explicitly relied upon in the complaint"); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n. 9 (3rd Cir. 1993) (quoting *Pension Benefit*); *see also Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 257 (3d Cir. 2006) (explaining that a court may look to public records in resolving a 12(b)(6) motion); *Shelley v. Wilson*, 339 Fed. App'x. 136, 137 n.2 (3d Cir. 2009 (same).

the tenure charges in a lengthy opinion.[3] *Id.* at 120-58. On April 22, 2016, Tobia moved to vacate the arbitrator's decision in New Jersey Superior Court, Ocean County, Chancery Division. *See id.*, Ex. B. The Superior Court upheld the decision on June 30, 2016, *see id.*, Ex. D, and on March 12, 2018, the Appellate Division affirmed. *See id.*, Ex. F.

B.   Plaintiff's Federal Complaint

Tobia argues that she was fired for whistleblowing—*i.e.*, objecting to Lakewood's abuses, such as its diverting public funds to non-public schools, *see* Opp. Br., at 3-4, 11-12, and disclosing this information to state and federal authorities. *See* Compl., ¶¶ 92, 108-38. To that end, Tobia filed an eight-count federal Complaint against Lakewood and various individual Board members. Count One alleges that Defendants violated the New Jersey Conscience Protection Act ("CEPA") by terminating her after she voiced concerns about their purported abuses. Counts Two and Six assert First Amendment, Due Process, and Equal Protection violations under 42 U.S.C. § 1983. With respect to her First Amendment claim, Tobia alleges that Defendants fired her for speaking about a matter of public concern, *i.e.*, Lakewood's decisions regarding student placement and public funds. With respect to her Equal Protection claims, Tobia alleges that Defendants fired her because she is not a member of the Jewish faith and because she "took positions . . . contrary to . . . Lakewood's Orthodox power bloc." *See* Opp. Br., at 36-38. As to her Due Process claim, Tobia alleges that the state-level proceedings were a "complete farce," Opp. Br., at 31, because Azzara filed tenure charges as a pretext for removing an "antagonist," *see id.* at 32, and "concealed [his]

---

3       In general, the arbitrator found that Lakewood had made a *prima facie* case supporting its charges. The arbitrator also found that Plaintiff failed to meet her burden of production with affirmative evidence or an exculpatory defense. *See* Arbitrator's Award, Ex. B, at 120-21. Ultimately, the arbitrator concluded, "[t]he District's *prima facie* showing of [Tobia's] unbecoming conduct was easily accomplished based upon the voluminous evidence relied upon by the [District] in bringing the tenure charges, coupled with the credible testimony of its witnesses." *See* Ex. A, Pl.'s Apr. 25, 2018 Letter Attach, at 5.

true reasons" from the arbitrator and courts. Opp. Br., at 33. Based on the alleged wrongful termination, Counts Three and Four assert claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Count Five asserts violations of the New Jersey Law Against Discrimination. Count Seven asserts violations of public policy. Count Eight asserts intentional infliction of emotional distress.[4]

Plaintiff filed the Complaint on August 8, 2016, while her state court appeal was pending. Defendants then moved to dismiss the Complaint for failure to state a claim. I denied the motions without prejudice, and issued a stay based on the abstention doctrine in *Younger v. Harris*, 401 U.S. 37 (1971). *See Tobia v. Lakewood Bd. of Educ.*, No. 16-4850, 2017 WL 1206010, at *3, *5 (D.N.J. Mar. 31, 2017) (explaining that the factual allegations forming the basis of Plaintiff's claims were still at issue in state court on appeal). After the Appellate Division entered a judgment affirming Plaintiff's termination, I vacated the stay and reinstated the action, and Defendants renewed their motion, which is currently pending. I also ordered supplemental briefs on the *Rooker-Feldman* doctrine, which bars federal courts other than the Supreme Court from sitting in review of state court decisions. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

C.  The Parties' Arguments

Defendants move to dismiss the Plaintiff's Complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), on collateral estoppel grounds, and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Defendants first argue that the *Rooker-Feldman* doctrine bars the Court from exercising subject matter jurisdiction. Even if the

---

4       Notably, Tobia's Complaint fails to allege any facts supporting her claim that Defendants acted illegally in any way. Tobia also fails to allege with any specificity that she voiced concerns about, or spoke out against, Defendants' alleged abuses.

Court has subject matter jurisdiction, Defendants argue that Plaintiff is collaterally estopped from raising a retaliation defense, because the arbitrator already adjudicated that issue. Assuming that collateral estoppel does not bar Plaintiff's retaliation defense, Defendants nevertheless argue that Plaintiff has failed to state a plausible claim for relief under 42 U.S.C. § 1983, the Fourteenth Amendment, the First Amendment, or against any individual Lakewood Board member.

In response, Plaintiff argues that *Rooker-Feldman* does not strip this Court of subject matter jurisdiction. Plaintiff then argues that the arbitrator never adjudicated whether Lakewood retaliated against her for engaging in protected activity, because she did not raise that defense in the tenure proceeding, and as such, collateral estoppel does not preclude litigating it here. Plaintiff also argues that she has sufficiently plead Due Process, Equal Protection, and First Amendment violations and stated a plausible claim for relief against individual Lakewood Board members.

## II.    LEGAL STANDARD

A court has an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *Bracken v. Matgouranis*, 296 F.3d 160, 162 (3d Cir. 2002) ("[T]his Court has a continuing obligation to sua sponte raise the issue of subject matter jurisdiction when it is in question."); *Morel v. INS*, 144 F.3d 248, 251 (3d Cir. 1998) ("[A federal] court, including an appellate court, will raise lack of subject-matter jurisdiction on its own motion."); *see also Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action" in its entirety. Fed. R. Civ. P. 12(h)(3); *Arbaugh*, 546 U.S. at 514.

Rule 12(b)(6) permits a court to dismiss an action if a plaintiff fails to state a claim upon which relief can be granted. When evaluating a 12(b)(6) motion, a court must "accept all factual

allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). A complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To determine whether a complaint is plausible on its face, a court conducts a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court should "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Iqbal,* 556 U.S. at 675). Second, the court must identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal,* 556 U.S. at 679). For example, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678. Third, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 680). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III.    DISCUSSION

### A. The *Rooker-Feldman* Doctrine

As a threshold matter, the parties dispute whether, pursuant to the *Rooker-Feldman* doctrine, this Court has power to hear this case. Defendants argue that this is a paradigmatic case in which *Rooker-Feldman* bars subject matter jurisdiction, while Plaintiff argues that subject

matter jurisdiction exists primarily because she does not allege an injury from the state court judgment itself, nor seek review or repeal of it.

The *Rooker-Feldman* doctrine "prevents the lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging state-court judgments rendered before the district court proceedings commenced," even if the courts would otherwise be empowered to exercise jurisdiction under their statutory grant of authority. *Lance v. Dennis*, 546 U.S. 459, 460 (2006) (quotation omitted); *see also Daniels v. Cynkin*, 34 F. Supp. 3d 433, 438 (D.N.J. 2014). In other words, *Rooker-Feldman* strips federal courts of jurisdiction over cases "that are essentially appeals from state-court judgments." *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 315 (3d Cir. 2014); *Cardillo v. Neary*, 756 Fed. App'x. 150, 153 (3d Cir. 2018); *see also Rooker*, 263 U.S. at 416 ("To [reverse or modify a judgment for errors] would be an exercise of appellate jurisdiction. The jurisdiction possessed by the District Court is strictly original."); *Feldman*, 460 U.S. at 482 ("[A] United States District Court has no authority to review final judgments of a state court in judicial proceedings."); *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005) (affirming, but limiting, *Rooker* and *Feldman*); *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 167-69 (3d Cir. 2010) (elaborating the *Rooker-Feldman* test in light of *Exxon Mobil*).

Because for a long time lower courts construed *Rooker-Feldman* "to extend far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law," the Supreme Court has "confined" the doctrine's operation to "narrow ground." *Exxon Mobil*, 544 U.S. at 283-84; *see also Lance*, 546 U.S. at 464-66 (emphasizing that *Rooker-Feldman* "applies only in limited circumstances"); *Gary v. Braddock*

*Cemetery*, 517 F.3d 195, 200 n.5 (3d Cir. 2008) (encouraging caution in applying *Rooker-Feldman*); *Cardillo*, 756 Fed. App'x. at 153 (same). *Rooker-Feldman* bars a federal court from proceeding with an action only where "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complain[s] of injuries caused by [the] state-court judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Great Western*, 615 F.3d at 166 (quoting *Exxon Mobil*, 544 U.S. at 284). "The second and fourth requirements are the key," *id.*, but if a defendant fails to establish any of the four, then the court retains subject matter jurisdiction over the case. In the present matter, Plaintiff clearly lost in state court, but the parties dispute whether the other *Rooker-Feldman* requirements are met.

> i.     *Whether Plaintiff Complains of an Injury Caused by the State Court Judgment*

The second, and "key," *Rooker-Feldman* requirement is that a plaintiff must allege an injury caused by the state court judgment itself. Plaintiff, here, argues that her injuries are independent of the state court judgment because they derive from Defendants' purportedly retaliatory decision to file tenure charges.

*Rooker-Feldman* does not "stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Exxon Mobil*, 544 U.S. at 293. What matters is whether the injuries alleged in the federal suit are "inextricably intertwined" with the judgment in the state suit. *Feldman*, 460 U.S. at 486; *Great Western*, 615 F.3d at 170 (explaining that "[w]hen a federal plaintiff brings a claim, whether or not raised in state court, that asserts injury caused by a state-court judgment and seeks review and reversal of that judgment, the federal claim is 'inextricably intertwined' with the state

judgment," but noting that the phrase "inextricably intertwined . . . is simply a descriptive label attached to claims that meet the requirements outlined in *Exxon Mobil*").

One way to determine whether a federal and state suit are inextricably intertwined is to evaluate the source of a plaintiff's injuries. "[W]hen the source of the injury is the defendant's actions (and not the state court judgments), the federal suit is independent, even if it asks the federal court to deny a legal conclusion reached by the state court." *Great Western*, 615 F.3d at 166-67. Hence, if a plaintiff "present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction." *Exxon Mobil*, 544 U.S. at 283; *accord GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993); *Noel v. Hall*, 341 F.3d 1148, 1163-64 (9th Cir. 2003); *Coles v. Granville*, 448 F.3d 853, 859 (6th Cir. 2006); *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 719 (4th Cir. 2006). "The critical task is [] to identify those federal suits that profess to complain of injury by a third party, but actually complain of injury 'produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it.'" *Great Western*, 615 F.3d at 167 (quoting *Hoblock v. Albany County Board of Elections*, 422 F.3d 77, 88 (2d Cir. 2005)). Another "useful guidepost is the timing of the injury, that is, whether the injury complained of in federal court existed prior to the state-court proceedings and thus could not have been 'caused by' those proceedings." *Great Western*, 615 F.3d at 167; *see also McKithen v. Brown*, 481 F.3d 89, 98 (2d Cir. 2007).

Plaintiff claims to be the victim of various unconstitutional and illegal conduct: (i) retaliation under the First Amendment and CEPA for speaking out against illegal funding decisions and student placements; (ii) disparate treatment under the Equal Protection Clause and the New Jersey's discrimination statute for not being a member of the Jewish faith and for taking positions "contrary to" the Orthodox community; and (iii) procedural deficiencies under the Due Process

Clause for the pretextual nature of the state-level proceedings. Clearly, Plaintiff's First Amendment, CEPA, and Equal Protection claims arise from Defendants' alleged illegal motive for filing tenure charges. In this regard, Plaintiff challenges the constitutionality of Defendants' conduct, which merely *resulted in* the adverse state court judgment, not the validity of the judgment itself. Perhaps the state court ratified those injuries, or acquiesced in them, or failed to provide redress for them, or did not consider them at all. The judgment, however, did not cause the complained-of injuries such that *Rooker-Feldman* would apply.

Plaintiff's purported due process claim in some ways relates to the state court judgment. Specifically, as part of her due process claim, Plaintiff insists that the state-level proceedings were a "sham" and a "complete farce" because Azzara, the state monitor, "deliberately . . . misrepresent[ed]" the "true reason behind Plaintiff's Tenure revocation." Opp. Br., at 32-35. Azzara brought tenure charges against Plaintiff, in part, because she favored *non*-public schools in violation of district policy and state law. *See* Arbitrator's Award, Ex. A., at 122-35 (listing findings of fact). Yet, one month after doing so, Azzara allegedly emailed an advocacy group for non-public schools stating that he had "removed" one of the "biggest antagonists from the public-school administration team." *Id.* Plaintiff's *opposition* to non-public schools, rather than her support for them, she asserts, is the real reason for her "discipline and removal" as well as her state court loss. *Id.* at 34. "The fact that Defendants concealed [their real motive] from the State Arbitrator and the NJDOE Commissioner, as well as ultimately to the Appellate Division," *id.* at 33, rigged "the entire process," *id.* at 35, forced Plaintiff to participate in a "completely tainted" system, *id.*, and violated Plaintiff's due process rights. In effect, Plaintiff complains that Azzara produced tenure charges against her for improper reasons, and procured her termination thereafter under false pretenses, misleading everyone in the process.

Although Defendants imply that this particular injury constitutes an attack on the state court judgment, *Rooker-Feldman* does not sweep that broadly.[5] *Great Western*, 615 F.3d at 171. Plaintiff does not "contend[] that the state court decisions . . . were themselves in violation of the Constitution," which might well bar her claim here. *Id.* Plaintiff instead claims that "people involved in the decision [to file tenure charges against her] violated some independent right," such as "the right to an impartial forum," insofar as that right exists. *Id.*; *see also Nesses v. Shepard*, 68 F.3d 1003, 1005 (7th Cir. 1995) (referring to "a tribunal uncontaminated by politics"). To the extent that the real basis for the tenure charges against Plaintiff, together with Azzara's purported failure to disclose that basis, undermine Plaintiff's right to "a hearing in front of . . . a neutral and impartial decision-maker," *Rooker-Feldman* is not a bar to subject matter jurisdiction. *See* Opp. Br., at 34; *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases."). Plaintiff may sue in this Court to vindicate that right, which she alleges *itself* caused the adverse and harmful state court judgment against her. *See Nesses*, 68 F.3d at 1004-05 (holding that *Rooker-Feldman* did not bar plaintiff's allegation that he lost in state court because of a conspiracy among the judges and lawyers); *see also Great Western*, 615 F.3d at 173; *McCormick v. Braverman*, 451 F.3d 382, 392 (6th Cir. 2006) (holding that *Rooker-Feldman* did not bar allegations that the defendants committed an abuse of process in the divorce proceedings); *Ernst v. Child & Youth Servs.*, 108 F.3d 486, 491-92 (3d Cir. 1997) (holding that *Rooker-Feldman* does not bar a claim alleging that defendants violated plaintiff's due process rights by making biased recommendations to the state court, resulting in an improper ruling); *Brokaw v. Weaver*, 305 F.3d 660, 662 (7th Cir. 2002)

---

5       Even if Defendant were correct on this point, I could sever the claim barred by *Rooker-Feldman* and proceed with the remainder. *See, e.g.*, *McCormick*, 451 F.3d at 384 (holding that, while *Rooker-Feldman* barred some claims, the remainder were "independent" claims over which the court had jurisdiction); *Great Western*, 615 F.3d at 168 (citing *McCormick* with approval).

(permitting a claim that "defendants conspired—prior to any judicial involvement—to cause false child neglect proceedings to be filed, resulting in her removal from her home in violation of her . . . substantive and procedural due process rights").

Neither can Plaintiff's allegations be characterized as an attack on the state court judgment in disguise. First, Plaintiff seeks a form of relief unavailable under state law. Second, Plaintiff's alleged injury—Azzara's secret and improper basis for seeking to dismiss Plaintiff—occurred before judicial involvement. *See, e.g.*, *Ernst*, 108 F.3d at 492; *Brokaw*, 305 F.3d at 662. Even if the state courts relied on Azzara's representations in affirming what Plaintiff insists are unconstitutional tenure charges, resulting in an improper legal conclusion, at most the state court decision can be said to "ratify, acquiesce in, or leave unpunished" Azzara's independent conduct. *Great Western*, 615 F.3d at 167. Plaintiff does not point to any procedurally deficient action on the part of the state courts themselves, nor are her accusations against Azzara a trojan horse for an attack on the state court judgment, since they preceded—and thus could not be produced by—the judgment. *See Hoblock*, 422 F.3d at 88.

It is true, of course, that Plaintiff cannot ultimately show that Azzara's actions injured her without attacking the state court judgment. Without an adverse judgment there is no harm, and without harm there is no constitutional tort. Put differently, Plaintiff cannot claim that Azzara harmed her unless she also claims that the judgment affirming the tenure charges is erroneous. In this regard, the state court judgment could be said to deprive Plaintiff of property without due process of law. Even so, *Rooker-Feldman* is not a jurisdictional bar for two reasons. For one, because Plaintiff alleges an independent injury, it is immaterial whether her Complaint also asks the Court to deny a legal conclusion reached by the state court. *See Exxon Mobil*, 544 U.S. at 293.

In addition, as a basis for damages, Plaintiff seeks to show, not merely that the state court judgment is incorrect, but that Azzara's conduct caused the incorrect judgment.

In short, Plaintiff complains that Azzara engaged in pre-judgment malice or bias in filing the tenure charges in the first place, which does not trigger the application of *Rooker-Feldman*, because it is not an allegation that the state court itself violated due process, *i.e.*, it does not allege harm produced by the state courts' intentions, reasoning, procedures, or similar. *Cf. Walsh v. Walsh*, No. 16-4242, 2017 WL 923860, at \*5 (D.N.J. Mar. 8, 2017) (applying *Rooker-Feldman* to bar a claim where the plaintiff alleged that a state judge "ignored all the laws . . . without cause").

Finally, Defendants suggest that *Rooker-Feldman* bars Plaintiff's federal Complaint because the Complaint shares underlying facts with the state court action. Defendants' argument in this regard effectively asserts preclusion. As such, it does not relate to this Court's subject matter jurisdiction under *Rooker-Feldman*. *See, e.g.*, *Exxon Mobil*, 544 U.S. at 293 ("Preclusion is not a jurisdictional matter."); Fed. R. Civ. P. 8(c) (listing res judicata as an affirmative defense). In fact, it cuts the other way for *Rooker-Feldman* purposes: to the extent that the federal and state actions share underlying facts, it is more likely that Plaintiff is complaining of injuries caused by Defendants' conduct, and less likely that Plaintiff is challenging harm produced by the state court judgment. Accordingly, I find that the state court judgment did not cause Plaintiff's injuries.

*ii.*     *Whether Judgment Was Rendered Before Plaintiff Filed Suit in this Court*

My finding that Plaintiff has not alleged injuries caused by the state court judgment is sufficient to render *Rooker-Feldman* inapplicable. To be sure, however, I will analyze the final two requirements, which provide independent bases for rejecting *Rooker-Feldman*'s applicability here. The third *Rooker-Feldman* requirement is that the state court must render judgment before the plaintiff filed her federal complaint. Defendants argue that this requirement is met because the

state trial court ruled against Plaintiff before she filed suit in this Court. Plaintiff argues that *Rooker-Feldman* does not apply because her appeal was still pending at the time of her Complaint.

"The Third Circuit has not yet ruled on the question of when state court proceedings have ended for *Rooker-Feldman* purposes." *Daniels*, 34 F. Supp. 3d at 439. Notably, however, in *Exxon Mobil*, the Supreme Court unequivocally stated that "neither *Rooker* nor *Feldman* supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains *sub judice* in a federal court." 544 U.S. at 1257. This has led every federal circuit to address the issue since *Exxon Mobil* to conclude that state court proceedings are not final for the purposes of *Rooker-Feldman* until the appeals process has ended, even if the state court adjudication becomes final after the federal suit commences but before the federal suit is decided. *See, e.g.*, *Guttman v. Khalsa*, 446 F.3d 1027, 1032 (10th Cir. 2006) ("State proceedings had not ended when [plaintiff] filed his federal court claim. As such, the *Rooker-Feldman* doctrine does not apply and the district court did have subject matter jurisdiction."); *Federacion De Meastros De Puerto Rico v. Junta De Relaciones Del Trabajo De Puerto Rico*, 410 F.3d 17, 24 (1st Cir. 2005) ("If federal litigation is initiated *before* state proceedings have ended, then—even if the federal plaintiff expects to lose in state court and hopes to win in federal court—the litigation is parallel, and the *Rooker-Feldman* doctrine does not deprive the court of jurisdiction."); *Mothershed v. Justices of the Supreme Court*, 410 F.3d 602, 604 n.1 (9th Cir. 2005) ("Proceedings end for *Rooker-Feldman* purposes when the state courts finally resolve the issue that the federal court plaintiff seeks to relitigate in a federal forum."); *Hoblock*, 422 F.3d at 89 (finding that the state suit terminated only when the highest state court issued its ruling, and holding that "the federal suit must follow the state judgment" for *Rooker-Feldman* to apply); *Dornheim v. Sholes*, 430 F.3d 919, 923-24 (8th Cir. 2005) (finding that

"the *Rooker/Feldman* doctrine precludes federal district court jurisdiction only if the federal suit is commenced after the state court proceedings have ended," and holding that *Rooker-Feldman* did not bar jurisdiction even though the state court proceeding ended while the federal court case was still pending). This rule tracks the final judgment rule governing the Supreme Court's appellate jurisdiction. *See, e.g.*, *Federacion De Meastros*, 410 F.3d at 17, 24, n.10 (concluding, in part, that a state proceeding has ended when the decision becomes appealable under § 1257 because the highest state court has issued its final decision); *see also Parkview Assocs. Partnership v. City of Lebanon*, 225 F.3d 321, 324 (3d Cir. 2000) ("The *Rooker-Feldman* doctrine is based on the statutory foundation of 28 U.S.C. § 1257."). Hence, where a federal suit commences before a state adjudication has made its way through the entirety of the appeals process, there is concurrent jurisdiction, and "any effect that the state court rulings might have on [a pending] federal action is limited to the application of preclusion law." *Dornheim*, 430 F.3d at 924. I am persuaded by the Circuits' unanimity on this issue, and that the Third Circuit would find similarly.

Even if Defendants were correct that Plaintiff has alleged an injury caused by the state court judgment itself, then, *Rooker-Feldman* would be inapplicable, because Plaintiff filed her federal Complaint well before the appeals process ran its course. The state trial court issued its judgment against Plaintiff on June 30, 2016. The Appellate Division did not affirm the trial court's decision until March 12, 2018. Meanwhile, on August 8, 2016, nineteen months before her appeal concluded in an adverse judgment, Plaintiff filed her federal Complaint.[6] Regardless of the source

---

[6]     Defendants cite *Walsh* to argue that Plaintiff's pending appeal has no bearing on whether judgment has been rendered in state court. 2017 WL 923860, at *4. The Third Circuit affirmed *Walsh*. 763 Fed. App'x. 243 (3d Cir. 2019). However, it does not appear that the district court considered the possibility that the plaintiff's appeal might render *Rooker-Feldman* inapplicable. In fact, that court simply wrote that "[p]laintiff pleads . . . that the judgment against him was rendered before he filed the instant action in federal court," 2017 WL 923860, at *4, suggesting that the plaintiff conceded, or never briefed, the issue. The Third Circuit, in turn, did not have occasion to consider the effects of the plaintiff's appeal, *see* 763 Fed. App'x. at n.2, writing only that, because the state trial judge's "order preceded [plaintiff's] federal action,"

of Plaintiff's injuries, *Rooker-Feldman* is also not a bar to subject matter jurisdiction for this reason.

### iii.        Whether Plaintiff Asks this Court to Review and Reject the State Court Judgments

The final *Rooker-Feldman* requirement is that Plaintiff must ask the federal court to review and reject the state court judgment. Defendants argue that, because Plaintiff seeks to reverse her termination, her Complaint meets this requirement. Plaintiff argues that *Rooker-Feldman* is inapplicable since she seeks damages related to Defendants' pre-judgment conduct, not a decision overruling the state court judgment.

The question whether a plaintiff invites review and rejection of a state court judgment is "closely related" to the question whether the plaintiff's injury is caused by the state court judgment. *Great Western*, 615 F.3d at 167-68. However, a plaintiff does not seek review and rejection of a judgment merely because she files a subsequent federal suit on the same subject matter. *Id.* at 168. The key is "whether the plaintiff's claims will require appellate review of state-court decisions by the district court." *Id.* at 159. "'Prohibited appellate review 'consists of a review of the proceedings already conducted by the lower tribunal to determine whether it reached its result in accordance with law.'" *Id.* (quoting *Bolden v. City of Topeka, Ks.*, 441 F.3d 1129, 1143 (10th Cir. 2006)).

A court does not conduct appellate-style review where "a party attempts to litigate in federal court a matter previously litigated in state court." *Exxon Mobil*, 544 U.S. at 293. For instance, "'[i]f the matter was previously litigated, there is jurisdiction as long as the 'federal plaintiff present[s] some independent claim,' even if that claim denies a legal conclusion reached by the state court." *Exxon Mobil*, 544 U.S. at 293 1517 (internal citation omitted; alteration in

---

*Rooker-Feldman* applied. *Id.* at 245. Critically, the Third Circuit noted that its disposition "is not an opinion of the full Court and . . . does not constitute binding precedent." *Id.* at 244. For these reasons, too, I reject Defendants' argument that Plaintiff's appeal is "of no consequence in the *Rooker-Feldman* analysis." Def. Supp. Br., at 14.

original). Similarly, where a federal court "tries a matter anew and reaches a conclusion contrary to a judgment by the first court, without concerning itself with the bona fides of the prior judgment," the federal court "is not conducting appellate review, regardless of whether compliance with [its] judgment would make it impossible to comply with the [state court] judgment." *Great Western*, 615 F.3d at 168 (citing *Bolden*, 441 F.3d at 1143). Hence, a plaintiff seeks review and rejection of a state court judgment only if, as in the *Rooker-Feldman* cases, the plaintiff asks the federal court to undo or declare null and void the state court's decision based on an error contained therein. *See Rooker*, 263 U.S. at 414; *Feldman*, 460 U.S. at 468-69, 472-73.

Here, Plaintiff seeks damages to "vindicate[e] . . . independent rights that prohibit retaliation against her protected First Amendment activity and prohibit discrimination that violates the Equal Protection clause." Reply Br., at 5. This form of relief was unavailable at the state level. Plaintiff does not ask the Court to overrule the judgment affirming her termination, reinstate her as Supervisor for Special Education, issue an order vacating the state court decision, or declare an error exists in that decision. *Cf. Kemp v. Select Portfolio, Inc.*, No. 18-17215, 2019 WL 3369692, at *3 (D.N.J. July 26, 2019) (requesting injunctive relief); *Walsh*, 2017 WL 923860, at *5 (seeking declaratory relief); *Castro v. Lewis*, 777 Fed. App'x. 401, 406 (11th Cir. 2019) (requesting an order vacating the state supreme court's final judgment and referring to the judgment as "unlawful").

Even if Plaintiff's Complaint is an end-run around her termination, and my ruling made compliance with the state judgment difficult, Defendants would not have a basis to invoke *Rooker-Feldman*, since "the *Rooker-Feldman* doctrine does not apply merely because the claim for relief if granted would as a practical matter undermine a valid state court order." *In re Philadelphia Entertainment & Development Partners*, 879 F.3d 492, 503 (3d Cir. 2018); *see also Great Western*, 615 F.3d at 169 (rejecting that the crux of the *Rooker-Feldman* doctrine in this regard is "whether

compliance with the second judgment makes it impossible to comply with the first judgment"). That is, *Rooker-Feldman* does not bar jurisdiction merely because of the practical effect of the relief Plaintiff seeks, *i.e.*, because a judgment in Plaintiff's favor may functionally deny the state court judgment against her. *Rooker-Feldman* would be a jurisdictional bar only if I had to look to the "bona fides" of the state court judgment, or whether the state court's decision contains an error, in awarding relief. *Id.* Accordingly, regardless of whether Defendants have established the other requirements, *Rooker-Feldman* is not a bar to subject matter jurisdiction because Plaintiff has not asked this Court to review or reverse the state court judgment. *Accord Great Western*, 615 F.3d at 172.

For the reasons stated above, the *Rooker-Feldman* doctrine does not strip this Court of subject matter jurisdiction over Plaintiff's Complaint.[7]

B. Due Process

Before I discuss collateral estoppel, I address whether Plaintiff has adequately stated a due process claim in Count Six, since that doctrine does not preclude this claim. The Fourteenth Amendment forbids a state from depriving a person of life, liberty, or property without due process of law. *See* U.S. Const. amend. XIV, § 1. When a plaintiff sues under 42 U.S.C. § 1983 for a state actor's failure to provide procedural due process, as here, courts employ a "familiar two-stage analysis." *Robb v. City of Philadelphia*, 733 F.2d 286, 292 (3d Cir. 1984). Specifically, they ask (1) whether "the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property'"; and (2) whether the procedures available provided the plaintiff with "due process of law." *Id.*; *see also Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

---

7    This is not to say that Plaintiff's claims have merit. *See infra*.

A state employee protected by a tenure statute has a property interest in her job within the meaning of the Fourteenth Amendment. *See Arnett v. Kennedy*, 416 U.S. 134 (1974) (holding that due process applies where a statute permits termination "only for such cause as would promote the efficiency of the service"); *Cleveland Bd. of Educ. V. Loudermill*, 470 U.S. 532, 538-39 (1985) (affirming that a tenured teacher possesses a property right in continued employment, and describing the process due). Here, because Plaintiff is a tenured teacher, who is entitled by the New Jersey Administrative Code to retain her position except in the case of inefficiency, unbecoming conduct, or other just cause, the Fourteenth Amendment encompasses Plaintiff's property right in the job from which she was terminated.

"[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.'" *Loudermill*, 470 U.S. at 541 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). Indeed, the Supreme Court has described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis in original); *Bell v. Burson*, 402 U.S. 535, 542 (1971). A tenured teacher facing dismissal is therefore "entitled to oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story." *Loudermill*, 470 U.S. at 546; *see also Arnett*, 416 U.S. at 170-71 (opinion of Powell, J.); *id.* at 195-96 (opinion of White, J.).

The New Jersey Administrative Code in this case provides for both notice and a pre-termination hearing before an arbitrator. *Cf. Loudermill*, 470 U.S. at 549 (holding that "the

pretermination 'hearing,' though necessary, need not be elaborate," and simply must constitute an opportunity to respond). Indeed, Plaintiff's hearing featured trial-like procedural safeguards including legal representation, discovery, the opportunity to present evidence and cross-examine witnesses under oath, the opportunity to testify on one's own behalf, a meaningful explanation of the decision, and de novo review in state court. *See, e.g.*, *McDaniels v. Flick,* 59 F.3d 446, 461 (3d Cir. 1995); *Dykes v. SEPTA*, 68 F.3d 1564, 1571 (3d Cir. 1995).

Nevertheless, Plaintiff implies that Defendants violated her due process rights by jumping straight to tenure proceedings instead of providing her with an opportunity to challenge whether the proceedings themselves were necessary. *See* Opp. Br., at 33. Factually, however, that is not what happened. Azzara referred the tenure charges to the Board, the Board certified the charges and referred them to the Commissioner of Education. The Director of the Bureau of Cases and Controversies then reviewed the charges and notified Plaintiff that they warranted her termination if proven true. Only at that juncture did the Commissioner appoint an arbitrator. Even accepting that Plaintiff did not have an opportunity to challenge whether it was necessary to proceed to arbitration during this period of review, there is no basis to find that such a deficiency violates due process. The arbitration *was* Plaintiff's opportunity to challenge the charges, and nothing in the law supports the novel proposition that Plaintiff is entitled to a *pre-hearing* opportunity to respond when the hearing itself precedes the termination and includes adequate notice. *See Loudermill*, 470 U.S. at 549.

Plaintiff also argues that Defendants violated her due process rights because the tenure charges were pretextual. *See* Opp. Br., at 35. Specifically, Plaintiff insists that the arbitration and subsequent state court litigation were a "sham." *Id.* (citing *Moffit v. Tunhannock Area School District*, 160 F.3d 786 (M.D. Pa. 2016)). Aside from a single ambiguous email in which Azzara

purportedly stated that the Board removed an "agitator," there is no evidence supporting Plaintiff's claim of pretext. Importantly, evidence aside, even if Azzara had an ulterior motive for seeking to terminate Plaintiff, that is not the same as a challenge to the procedural sufficiency of state-level proceedings, which, here, complied in every respect with the Administrative Code's substantial safeguards and with constitutional due process. Plaintiff was "afforded full hearings with all of the protections of due process, such as are provided litigants in a court of law," *Winters*, 212 N.J. at 88, and hence, she has failed to allege a plausible due process violation.

## C.  Collateral Estoppel

Defendants next argue that Plaintiff is collaterally estopped from raising a retaliation defense, which underlies the remaining claims asserted in this case, because the state court already adjudicated that issue. *See* Mot. to Dismiss, at 16-24. Plaintiff argues that she is not precluded from claiming retaliation because she did not raise it in the proceedings below, or if she did, she merely "suggested instances of it." Opp. Br., at 23.

### i.      *Whether Arbitration Decisions Carry Preclusive Effect*

Preclusion law governs the "[d]isposition of a federal action once a state court adjudication is complete," *Exxon Mobil*, 544 U.S. at 293, "should the *Rooker-Feldman* doctrine not apply." *Great Western*, 615 F.3d at 170. As a rule, federal courts "give the same preclusive effect to a state-court judgment as another court of that State would give." *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523 (1986); *accord Matsushita Elec. Industrial Co. v. Epstein*, 516 U.S. 367, 373 (1996); *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380-81 (1985); *see also Aldrich Nine Assoc. v. Foot Locker Specialty, Inc.*, 306 Fed. App'x. 723, 726 (3d Cir. 2009); *Del. River Port Auth. v. Fraternal order of Police, Penn–Jersey Lodge 30*, 290

F.3d 567, 573 (3d Cir. 2002)); 28 U.S.C. § 1738 (interpreted by *San Remo Hotel v. City & Cnty. Of S.F.*, 545 U.S. 323, 336 (2005), to encompass collateral estoppel not just res judicata).

Collateral estoppel extends to state-level agency or administrative adjudications, to the extent that state law gives such adjudications preclusive effect, as long as the agency acted in a judicial capacity and the parties had an adequate opportunity to litigate the issue. *See Univ. of Tennessee v. Elliott*, 478 U.S. 788, 798-99 (1986) ("[F]ederal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts."); *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422 (1966) ("When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose.").[8]

New Jersey courts give agency or administrative adjudications full preclusive effect, *i.e.*, they "may form the basis for application of the doctrine of collateral estoppel," as long as the proceedings provide "'significant procedural safeguards' similar to those that are provided to litigants in courts of law." *Winters v. North Hudson Regional Fire and Rescue*, 212 N.J. 67, 87 (2012) (quoting *Olivieri v. Y.M.F. Carpet, Inc.*, 186 N.J. 511, 521 (2006)); *see also Hennessey v. Winslow Twp.,* 183 N.J. 593, 600 (2005) ("[A]dministrative tribunals can and do provide a full and fair opportunity for litigation of an issue."); *Ensslin v. Twp. of N. Bergen*, 275 N.J. Super. 352, 369, 646 (App. Div. 1994), *certif. denied,* 142 N.J. 446 (1995) (granting preclusion if the

---

[8]     In other words, federal courts accord preclusive effect to agency or administrative factfinding if the factfinder acted "in a judicial capacity" and provided the party against whom estoppel is asserted with a "full and fair opportunity" to litigate her claims. *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 192 (3d Cir. 1993) (defining full and fair opportunity to mean, in part, "ample opportunity to present his views and to cross-examine the witnesses against him"); *Peterson v. Holmes*, No. 11-2594, 2017 WL 1653949, at *5 (D.N.J. May 2, 2017).

"proceedings [] merit such deference"); *City of Hackensack v. Winner*, 82 N.J. 1, 29 (1980) ("[S]ince there are pronounced similarities in the exercise of judicial and quasi-judicial powers . . . court-fashioned doctrines for the handling of litigation . . . have some genuine utility and relevance in administrative proceedings.").

Moreover, in New Jersey, "an arbitration award, like an adjudicative determination of an administrative tribunal," can be "issue-preclusive." *Nogue v. Estate of Santiago*, 224 N.J. Super. 383 (App. Div. 1988); *Chattin v. Cape May Greene Inc.*, 216 N.J. Super. 618, 634-38 (App. Div. 1987); *Dylnicky v. Port Authority of New York and New Jersey*, 2009 WL 2850744, at *4-5 (N.J. Super. App. Div. Sept. 8, 2009). This is consistent with New Jersey's public policy favoring the finality of arbitrations. *See, e.g.*, *Barcon Associates v. Tri-County Asphalt Corp.*, 86 N.J. 179, 187 (1981) ("Arbitration can attain its goal of providing final, speedy and inexpensive settlement of disputes only if judicial interference with the process is minimized.") (citations omitted). Critically, "[f]indings made as part of the discipline process will have preclusive impact in later employment-discrimination litigation raising allegations of employer retaliation based on the same transactional set of facts." *Winters*, 212 N.J. at 74.

The arbitration decision in this matter clearly carries preclusive effect. First, the regulatory framework governing tenure dismissals, supplied by the New Jersey Administrative Code, provides comprehensive trial-like process to employees, such as Plaintiff. *See* N.J.S.A. 18A:6-10 to 18A:6-17.2 (detailing the requirements for bringing charges, certifying charges, conducting hearings, rendering decisions, reviewing decisions, and vacating decisions).[9] Second, the arbitrator

---

9    The New Jersey Tenure Law provides teachers with substantial procedural protections. Specifically, "N.J.S.A. 18A:6-10 provides that no tenured employee of the public school system 'shall be dismissed or reduced in compensation . . . except for inefficiency, incapacity, unbecoming conduct, or other just cause.' If the [tenure] charges are substantiated, they are submitted for review by the Commissioner. N.J.S.A. 18A:6-11. If the Commissioner determines the tenure charges merit termination, the case is referred to an arbitrator. N.J.S.A. 18A:6-16. 'The arbitrator's determination shall be final and

both acted in a judicial capacity and followed the Administrative Code to the letter. *See O'Hara v. Board of Education*, 590 F. Supp. 696, 701 (D.N.J. 1984) (finding that an agency acted in a judicial capacity where it "had a full hearing and provided an opportunity for both parties to appear and be represented by counsel, to present evidence and to call, examine and cross-examine witnesses"). Plaintiff received notice of the hearing, engaged in scheduled pre-hearing discovery, and had ample time to prepare her case. The hearing consisted of four non-consecutive days of adversarial testimony before a neutral decisionmaker during which Plaintiff had counsel present, offered evidence, cross-examined witnesses, issued subpoenas, and received an opportunity to contest the tenure charges against her. Witnesses were sequestered and questioned under oath. Plaintiff also received a complete, written explanation of the arbitrator's decision and *de novo* review in multiple levels of state court. These procedures constitute "significant [] safeguards similar to those that are provided . . . in courts of law," *Winters*, 212 N.J. at 87; *see also Habick v. Liberty Mut. Fire Ins. Co.*, 320 N.J. Super. 244, 257 (App. Div. 1999); *Konieczny v. Micciche*, 305 N.J. Super. 375, 384-87 (App. Div. 1997), and fully comport with due process. *Utah Construction*, 384 U.S. at 422. Because Plaintiff had the chance to fully make her case, and the arbitrator acted in a judicial capacity, I find that the arbitration decision is entitled to preclusive effect.

      ii.     *Whether Collateral Estoppel Applies Here*

The crux of the parties' dispute is whether they litigated Plaintiff's retaliation defense during arbitration. Plaintiff argues that, even if the arbitration decision is entitled to preclusive effect, collateral estoppel should not apply because she never raised retaliation as a defense and, even if she did, she never argued that Defendants retaliated against her *for engaging in protected*

---

binding,' but 'shall be subject to judicial review and enforcement as provided pursuant to N.J.S.A. 2A:24-7 through N.J.S.A. 2A:24-10.'" *Bound Brook Bd. of Educ. v. Ciripompa*, 228 N.J. 4, 11-12 (2017) (quoting N.J.S.A. 18A:6-17.1(e)).

*activity specifically—i.e.*, for speaking out against the Board's purported abuses. *See* Opp. Br., at 13-15. Defendants insist otherwise. *See* Mot. to Dismiss, at 23-24.

Collateral estoppel "prevents a party who litigated an issue previously from rearguing that particular issue." *James v. Heritage Valley Fed. Credit Union*, 197 Fed. App'x. 102, 105 (3d Cir. 2006); *Szehinskyj v. Atty. Gen. of the United States*, 432 F.3d 253, 255 (3d Cir. 2005). "[B]ecause the administrative proceeding in this case took place in New Jersey, the Court must determine whether a New Jersey state court would accord the [arbitrator's] ruling with preclusive effect." *Peterson v. Holmes*, No. 11-2594, 2017 WL 1653949, at *5 (D.N.J. May 2, 2017); *see also Hoblock*, 422 F.3d at 94 (applying New York state law to determine whether an issue from a prior proceeding is issue-preclusive); *Carr v. Dep't of Human Resources*, No. 13-5478, 2019 WL 293229, at *8 (D.N.J. Jan. 23, 2019) (applying New Jersey state law to determine whether an administrative decision is issue-preclusive); *Local 1006, American Federation of State, County and Mun. Employees, AFL-CIO v. Wurf*, 558 F. Supp. 230, 233 (N.D. Ill. 1982) ("This Court is bound by statute to apply [Illinois state res judicata] principles."). This result obtains from the Full Faith and Credit Clause, which provides, in relevant part, that the "judicial proceedings of any court of any such State . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such States." 28 U.S.C. § 1738. The Supreme Court has interpreted § 1738 to require all federal courts to give preclusive effect to state court judgments "whenever courts of the State from which the judgments emerged would do so" under state law. *Allen v. McCurry*, 449 U.S. 90, 96 (1980).

Under New Jersey law, a party may not raise an issue in subsequent litigation if: "(1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final

judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding." *In re Estate of Dawson*, 136 N.J. 1, 20-21 (1994) (further citations omitted); *Allen v. V & A Bros.*, 26 A.3d 430, 444 (2011) (noting collateral estoppel should be applied flexibly) (citations omitted).[10] Defendants bear the burden of establishing all five elements. *See Mitchell v. Vincente*, No. 12-03394, 2014 WL 1092760, at *5 (D.N.J. Mar. 18, 2014); *Shtab v. Greate Bay Hotel and Casino, Inc.*, 173 F. Supp. 2d 255, 261 (D.N.J. 2001) ("The party seeking to invoke the doctrine of issue preclusion bears the burden of demonstrating what was determined in the prior adjudication."). "Reasonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel." *Kauffman v. Moss*, 420 F.2d 1270, 1274 (3d Cir. 1970).

Defendants assert collateral estoppel against Plaintiff, who was a party to all earlier proceedings. As such, there is no dispute as to element five. It is also clear that the arbitration decision was a final judgment on the merits, since the arbitrator sustained the tenure charges based on a preponderance of the evidence, and in turn, affirmed Plaintiff's termination. *See, e.g.*, *In re Brown*, 951 F.2d 564, 569 (3d Cir. 1991) (holding that "[f]inality for purposes of issue preclusion is a more 'pliant' concept than it would be in other contexts," that "the effectiveness of issue preclusion . . . does not require the entry of a judgment, final in the sense of being appealable," and that "collateral estoppel applies whenever an action is sufficiently firm to be accorded

---

10      "Although res judicata and collateral estoppel are affirmative defenses, they may be raised in a motion to dismiss." *Walzer v. Muriel, Siebert & Co., Inc.*, 221 Fed. App'x. 153, 155 (3d Cir. 2007); *see also M & M Stone Co. v. Pennsylvania*, 388 Fed. App'x. 156, 162 (3d Cir. 2010) (citing *Connolly Found. v. Sch. Dist. Of Haverford Twp.*, 461 F.2d 495, 496 (3d Cir. 1972)).

conclusive effect") (internal quotation marks omitted); *see also Hills Dev. Co. v. Twp. of Bernards*, 103 N.J. 1, 58-59 (1986)). I address the remaining three elements in turn.

        1.   <u>Whether the Issue to Be Precluded Is Identical to an Issue Already Decided</u>

In determining whether the issue to be precluded is identical to an issue already decided, New Jersey courts consider several factors: "whether there is substantial overlap of evidence or argument in the second proceeding; whether the evidence involves application of the same rule of law; whether discovery in the first proceeding could have encompassed discovery in the second; and whether the claims asserted in the two actions are closely related." *First Union Nat'l Bank v. Penn Salem Marina, Inc.*, 921 A.2d 417, 424 (N.J. 2007) (citations omitted).

Defendants argue that the arbitrator plainly rejected Plaintiff's retaliation defense and that *Winters* estops Plaintiff from relitigating that defense in any manner. While Plaintiff never expressly used the word "retaliation," *see* Arbitration Award, Ex. A., at 104-19, she need not do so to raise that issue. *See, e.g.*, *Winters*, 212 N.J. at 91 ("That [retaliation] was not addressed specifically is not fatal to the analysis."). In arbitration, Plaintiff asserted retaliation by claiming that a culture of fear among Lakewood employees left her with all of the hard decisions and that, because the buck stopped at her desk, she was "set up as the fall guy." *Id.* at 144-47. She also claimed that a state senator instructed Azzara to fire her for making certain student placement decisions. *Id.* In this sense, "everything [Plaintiff] pointed to, or at, was supposedly evidence of overall animosity and retaliatory bias by [Defendants]." *Winters*, 212 N.J. at 91.

Plaintiff attempts to rewrite the history of the arbitration proceeding to escape this conclusion. As Plaintiff now tells it, Lakewood's culture of fear merely established why she made improper decisions as Supervisor for Special Education, not why the Board terminated her. *See* Opp. Br., at 23. Yet, that characterization of the argument is inconsistent with the facts developed

during arbitration and with Plaintiff's position in that proceeding. The question whether Plaintiff

had "proffer[ed] and establish[ed] her affirmative or exculpatory defenses," *see* Arbitration Award,

Ex. A., at 120, hinged on "whether [politics or a culture of fear] was a motivating factor in whole

or in part *for the personnel decision made*," *id.* at 145 (emphasis added), including whether, as

alleged, a state senator demanded that Plaintiff be fired for her student placement decisions. *Id.* at

107. Contrary to her present position, Plaintiff never argued that Lakewood's culture of fear

motivated the malfeasance of which she was accused, but instead that Lakewood's culture of fear

motivated the Board's decision to bring charges. Simply put, if Plaintiff made hard decisions

regarding special education because she is not a member of the Jewish faith, and those decisions

were hard because they were "contrary" to the interests of the Jewish community and opposed by

a state senator, which paralyzed other Lakewood employees, Plaintiff effectively complains of

retaliation before the arbitrator. To the extent that the arbitrator rejected this defense, *id.*, his

decision carries preclusive effect. *See* Arbitrator's Award, Ex. A., at 121, 149 (dismissing

Plaintiff's argument after giving "full consideration . . . to the respective positions of the

parties").[11]

---

11      Not only is Plaintiff's retaliation claim closely related to her defense below, but the arbitrator's conclusion makes it implausible that a retaliatory motive could have played a determinative role in causing Plaintiff's termination under that line of case law, even if the arbitrator did not expressly mention such cases. A plaintiff bears the burden of showing that a retaliatory motive was "a determinative factor" in a defendant's termination decision. *See Donofry v. Autotote Sys., Inc.*, 350 N.J. Super. 276, 295-96 (App. Div. 2002) (collecting cases); *Rasmussen v. Vineland Bd. of Educ.*, No. 948-11, 2014 WL 7236525, at *5 (N.J. Super. App. Div. Dec. 22, 2014) (applying *Donofry* to a decision to dismiss a tenured teacher). In other words, a plaintiff must show not only that there was retaliation but that it "made a difference" in the defendant's decision to terminate her. Even assuming that "some animosity existed" between Plaintiff and Defendants, *Rasmussen*, 2014 WL 7236515, at *6, and that "politics, sectarian and non-sectarian alike," pervaded Lakewood, *see* Arbitration Award, Ex. A., at 145, the arbitrator foreclosed the possibility that retaliation played any role, much less a determinative one. *See id.* at 122-35 (making fifty-three findings of fact and holding that the Board's "*prima facie* showing of unbecoming conduct was easily accomplished"). Based on what the arbitrator deemed "voluminous evidence" supporting Defendants' tenure charges, *id.* at 135, "[t]his is not a case in which an employee [was] terminated based on a trumped-up charge or for an insubstantial reason. On the contrary, the evidence overwhelmingly points in the other direction—that the reason for [Plaintiff's] termination was [her] unbecoming conduct," including an instance of knowingly

Finally, Plaintiff suggests that the arbitrator did not decide her retaliation defense because her present theory of retaliation differs from the theory she raised below. Specifically, Plaintiff alleges in her Complaint that Defendants retaliated against her for speaking out against the Board's abuses, namely their use of public funds on non-public schools, not because of the culture of fear in Lakewood. For the purposes of collateral estoppel, however, this distinction is immaterial. First, the upshot of *Winters* is that there are "consequences" to Plaintiff's decision "not to present proofs to demonstrate" all dimensions of her retaliation defense. 212 N.J. at 90. *Winters* precludes Plaintiff not only from raising the same retaliation defense, but from offering "a more expansive presentation" of that defense, *i.e.*, a new theory as to why Defendants retaliated against her. *See Winters*, 212 N.J. 73. Just like in *Winters*, "[n]othing prevented [P]laintiff from presenting [her] defense more fully than [she] did," *i.e.*, from also claiming Defendants filed charges against her for whistleblowing. *Id.* Plaintiff must "accept the consequences of [her] strategy" to allege one theory of retaliation but not the other. *Id.* As a matter of law, Plaintiff does not get a second "bite at the apple" to support her retaliation defense with a theory she could have offered before but "fold[ed] [her] arms" at instead. *Id.* at 89-90.

In any event, the arbitrator made factual determinations foreclosing Plaintiff's new theory of retaliation. Overall, the arbitrator found no evidence that the Board favored sectarian interests or that Plaintiff voiced concerns about that, despite multiple interrogatories, "numerous emails provided by Petitioner," and a full adjudication of the Board's charges. *See, e.g.*, Arbitration Award, Ex. A., at 8. Moreover, the arbitrator found facts expressly contradicting Plaintiff's theory that the Board favored yeshivas, and fired her for blowing the whistle on that favoritism. Specifically, he found that *Plaintiff herself* favored sectarian schools despite repeated instructions

---

and willfully lying under oath, a "single event" which alone the arbitrator determined to be "more than sufficient" to justify her termination. *Rasmussen*, 2014 WL 7236525, at *6.

from the Board to *stop* doing so. *Id.* at 141-42. Courts Three, Four, and Ten, in particular, "chronicle Ms. Tobia's [] directives that classified students [ ] be placed at unapproved and sometimes unaccredited private schools, including yeshivas." *Id.* Plaintiff "entered into numerous agreements with parents and approved the placement of students at yeshivas without proper [statutory and regulatory] approval being received or even sought." *Id.* Even though yeshivas are "eliminated from [placement] consideration under any circumstances "due to their "sectarian nature," *id.* at 142, "Ms. Tobia repeatedly attempted to pull an 'end-run' around the State special education regulations by writing the illegal placements into IEPs, and entering into private contracts with the parents that provided for district reimbursement." *Id.* The arbitrator stressed that Plaintiff went so far as to "direct [colleagues] to hold IEP meetings and 'give the parents anything they wanted.'" *Id.* at 143. Based on these findings, the arbitrator dismissed the type of retaliatory conduct alleged here by Plaintiff.

In short, the arbitrator effectively concluded that Plaintiff "was justifiably removed for reasons that were independently proven and have no taint of retaliation, despite [her] claim otherwise. [Her misconduct] was of [her] own doing; no responsible public employer could ignore [this]. That the [arbitrator] spoke so strongly about the need to remove such transgressors from the ranks of public employment, especially to restore public confidence . . . only adds to the legitimacy of this termination." *Winters*, 212 N.J. 88. I am, therefore, "fully convinced" that the arbitrator "assessed [Plaintiff's] claim of retaliation, to the extent it was supported, when he rendered his findings," *Winters*, 212 N.J. at 91, and decided the issues being precluded here.

## 2. Whether the Issue Was Actually Litigated Below

In determining whether the issue below was actually litigated, New Jersey courts look to the Restatement (Second) of Judgments. Specifically, the Appellate Division of the New Jersey

Superior Court has noted that whether an issue was actually litigated for the purposes of collateral estoppel "is explained fully in comments d and e to § 27 of" the Restatement, which states that "'an issue is actually litigated . . . [w]hen an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined.'" *Allesandra v. Gross*, 453 A.2d 904, 908-09 (N.J. Super. Ct. App. Div. 1982).

It is clear that the parties actually litigated Plaintiff's "culture of fear" retaliation theory. To reiterate, Plaintiff argued before the arbitrator that "there was . . . fear on behalf of those staff members who were Orthodox for reprisals in the Orthodox community, if they made a decision contra to a member of that community . . . . it becomes apparent that when a controversial decision had to be made, they went to Ms. Tobia . . . to make that decision. In this way, it was easy to blame Ms. Tobia for the decision and no repercussions would come to them in the community. Apparently decisions were controversial enough concerning student placements in yeshivas, that Robert Singer, the state senator representing Lakewood, and the former mayor of Lakewood, went to [Azzara] and told him to fire Ms. Tobia." *See* Arbitration Award, Ex. A., at 106-07. The arbitrator unambiguously rejected that defense. In considering "whether [politics or a culture of fear] was a motivating factor in whole or in part for the personnel decision made," *see* Arbitration Award, Ex. A., at 145, the arbitrator found that "[t]he totality of the evidence convinces me that it was not." *Id.* Further, he found, "not an ounce of proof has been provided by Respondent in support of her further position that as a result of the pervasive culture, Orthodox staff members were reluctant to make hard decisions . . . went to Ms. Tobia instead because she was not Orthodox." *Id.* at 146. Indeed, "[a]ny suggestion that Ms. Tobia was somehow 'set up as the fall guy' by the inaction of her colleagues is not supported by the evidentiary record," *id.*, and "it is abundantly clear to me that Respondent was at all times 'driving the bus.'" *Id.*

It is also clear that the parties actually litigated Plaintiff's "protected activity" retaliation theory. First, Plaintiff testified on her own behalf, was cross-examined, and cross-examined Defendants' witnesses. In this regard, Plaintiff had every opportunity to proffer evidence or testimony that Defendants retaliated against her for any number of reasons, including for speaking out against the Board's alleged abuses, but did not do so. *See Winters*, 212 N.J. at 73. The arbitrator in turn "easily" sustained Defendants' *prima facie* case. *Id.* at 121, 135. The arbitrator found that Plaintiff's testimony not only failed to establish any defense, but corroborated many of the tenure charges against her. In particular, the arbitrator wrote, Plaintiff's testimony confirmed that *she* engaged in the very sectarian favoritism of which she now accuses Defendants. *Id.* at 106-07; *cf. Peterson*, 2017 WL 1653949, at *6 (finding an issue was not actually litigated because the plaintiff's testimony on the issue was "equivocal," and because the other party did not have a chance to cross-examine plaintiff). Other facts developed in the arbitration proceeding support the arbitrator's conclusion that Plaintiff, not the Board, improperly favored sectarian schools. *See supra*.

*Winters* further counsels that Plaintiff's retaliation defense was actually litigated. In *Winters*, the "New Jersey Supreme Court held that if a public employee raises a retaliation claim during an administrative proceeding . . . , then that employee is precluded from bringing a separate retaliation claim in later litigation." *May v. Borough of Pine Hill*, No. 10-2628, 2013 WL 663702, at *2 (D.N.J. Feb. 22, 2013). The plaintiff there claimed that, because he did not "zealously pursue his retaliation claim," the administrative tribunal did not "actually litigate" it, and thus he was not estopped from raising it anew. *Peterson*, 2017 WL 1653949, at *7. The New Jersey Supreme Court disagreed, holding that the plaintiff could not raise retaliation because he had a full and fair chance to litigate it before the tribunal, even if he decided not to. The court emphasized that, although the

plaintiff had not pursued his retaliation claim *fully*, he had made that strategic decision only after raising it initially, and could not "take advantage of his own tactic of throttling back on his claim." *Winters*, 212 N.J. at 88. Because retaliation was a "central theme" of the plaintiff's argument, it was immaterial for the purposes of collateral estoppel that he "chose not to present [before the tribunal] comprehensive proof." *Id.* The same is true in the present case. Just like the employee in *Winters*, Plaintiff's defense here hinged on retaliation, retaliation was a central theme, and Plaintiff asked the arbitrator to "rule on the question of retaliation." *Cf. May*, 2013 WL 663702, at *3. She cannot now amend that defense by alleging a different theory as to why Defendants retaliated against her, much less a theory which the arbitrator explicitly and implicitly rejected. Accordingly, I find that the issue to be precluded was properly raised, submitted for determination, and determined.

### 3.   Whether the Determination of the Issue Was Essential to the Judgment

In determining whether the issue decided was essential to the judgment, New Jersey courts again look to the Restatement (Second) of Judgments. The Restatement explains that an issue is not essential "if . . . the judgment is not dependent upon the determination[]," because "[s]uch determinations have the characteristics of dicta, and may not ordinarily be the subject of an appeal by the party against whom they were made." Restatement (Second) of Judgments § 27, cmt. h; *see also O'Leary v. Liberty Mut. Ins. Co.,* 923 F.2d 1062 (3d Cir. 1991) (rejecting the notion that an issue is not essential merely because it could have been avoided "under some hypothetical resolution of the dispute"); *Nat'l R.R. Passenger Corp. v. Pennsylvania Public Utility Com'n*, 288 F.3d 519, 527 (3d Cir. 2002). Hence, in determining whether an issue is essential, I look to whether the issue "was critical to the judgment or merely dicta." *O'Leary*, 923 F.2d at 1067.

As a matter of law, in tenure hearings, an arbitrator must consider "affirmative or exculpatory defenses" because they "shift" the "burden of production" to the school board to offer "substantial, credible evidence" of conduct unbecoming, inefficiency, or other just cause. *See* Arbitration Award, Ex. A., at 120-21; *see also Atkinson v. Parsekian*, 37 N.J. 143, 149 (N.J. 1962); *In re Tenure Hearing of Ziznewski*, No. 153-5/08, 2012 WL 1231874, at *1 (N.J. Super. App. Div. Apr. 13, 2012). If an employee "proffers and establishes" a defense against the school board's *prima facie* case, and the board fails to rebut that defense with further proof, then the board has not met its burden of justifying its tenure charges with a preponderance of the evidence, and the charges cannot legally be sustained. *Id.*

The arbitrator's analysis of Plaintiff's retaliation defense in this case was not merely dicta, but clearly critical to his judgment. The arbitrator sustained Defendants' tenure charges on the basis of their "prefatory showing." *See* Arbitration Award, Ex. A., at 136 ("The District's *prima facie* showing of unbecoming conduct was easily accomplished based upon the voluminous evidence relied upon by the Petitioner in bringing the tenure charges, coupled with the credible testimony of its witnesses."). The arbitrator could not have done so without also finding that Plaintiff failed to "proffer and establish" a defense, retaliation or otherwise. *Id.* A valid defense would rebut Defendants' *prima facie* case, shift the burden, and require "substantial and credible evidence" to sustain the tenure charges. Because the arbitrator expressly determined that Plaintiff did not "rebut[]" Defendants' prefatory showing with any defense, and that "the instant tenure charges must be **SUSTAINED**," Plaintiff's failure to prove a defense was necessarily essential to the judgment and could not have been mere dicta. *See* Arbitration Award, Ex. A., at 121. In sum, because all five requirements for collateral estoppel are met, Plaintiff is barred from claiming that

Defendants retaliated against her, including for engaging in protected activity and for being a non-Jewish member of the teaching staff.

    *iii.*    *Plaintiff's Claims*

    1.  <u>Counts Two and Six – First Amendment and Equal Protection under § 1983</u>

Defendants argue that the issue to be precluded, *i.e.*, retaliatory termination, bars all claims in Plaintiff's Complaint. I will address each in turn, starting with Plaintiff's various § 1983 claims. To advance a § 1983 claim, a plaintiff must show as part of her initial burden of proof that it is more likely than not that a defendant based its conduct, such as the adverse employment decision here, on unlawful considerations. *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973) (requiring plaintiff to make a *prima facie* showing of discrimination or disparate treatment by a preponderance of the evidence); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 254 n.6 (1981) (requiring plaintiff to establish a *prima facie* case giving rise to an inference of unlawful discrimination); *Furnco Constr. Corp. v. Waters*, 438 *U.S.* 567, 577 (1978) (explaining that a plaintiff has the burden of showing that "it is more likely than not" that a defendant's conduct was based on unlawful considerations); *Black v. Montgomery Cty.*, 835 F.3d 358, 364 (3d Cir. 2016) ("A plaintiff seeking relief under 42 U.S.C. § 1983 must demonstrate 'that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury.'" (quoting *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005)). Plaintiff's First Amendment and Equal Protection claims under § 1983 are clearly precluded in this case. The arbitrator rejected Plaintiff's retaliation defense, found cause to sustain Defendants' tenure charges, and concluded that Defendants lawfully terminated Plaintiff. His decision on this issue forecloses an element on which Plaintiff's § 1983 claims depends—that Defendants terminated Plaintiff based on unlawful considerations—which in turn defeats the

claims as a whole, as they cannot survive unless Plaintiff can go forward on every requirement. Because the arbitrator decided this issue against Plaintiff, and it is essential to any *prima facie* case under § 1983, her First Amendment and Equal Protection claims are, therefore, barred by collateral estoppel.

### 2. Count One – CEPA

Plaintiff is estopped from raising her Count One CEPA claim for similar reasons: the arbitrator addressed her retaliation defense, rejected it, and concluded that the Board acted lawfully in terminating her. In other words, after litigating her retaliation defense during arbitration, Plaintiff is barred from raising the same issue in a subsequent CEPA claim, as asserted in this case, based on the same allegedly retaliatory conduct. *See Winters*, 212 N.J. at 74 ("We [ ] put users of the public employment system of employee discipline on notice that integration of employer-retaliation claims should be anticipated and addressed where raised as part of the discipline review process . . . . That [Plaintiff] did not fully present [her] defense before the [arbitrator] and is now barred from a more expansive presentation of [her] claim of disparate treatment in a CEPA action is a consequence with which [she] must live.").

### 3. Counts Seven and Eight – Public Policy and Intentional Infliction of Emotional Distress

Defendants further argue that Counts Seven and Eight—in which Plaintiff alleges a violation of New Jersey public policy and intentional infliction of emotional distress—are precluded by CEPA's waiver provision.[12] Contrary to Defendants' assertion on this point, I do not

---

[12]     CEPA prohibits employers from taking retaliatory actions against employees "who 'blow the whistle' on organizations engaged in illegal or harmful activity." *Young v. Schering Corp.*, 141 N.J. 16, 23 (1995); N.J.S.A. 34:19-1 *et seq*. The CEPA waiver provision provides, in relevant part, that "the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." N.J.S.A. 34:19-8. The New Jersey Supreme Court has therefore held that CEPA blocks other claims based on the same retaliatory conduct, but not causes of action which are "substantially independent" of

need to decide whether CEPA's waiver provision bars the claims in Counts Seven and Eight. As with Counts Two and Six, collateral estoppel precludes these claims. To allege intentional infliction of emotional distress, a plaintiff must point to conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley v. Trenton Sav. Fund Soc'y*, 111 N.J. 355, 544 (1988) (applying the Restatement (Second) of Torts § 46 comment d). Plaintiff cannot meet her burden on that element in this case, since the arbitrator rejected the notion that Defendants retaliated against Plaintiff for not being Jewish, for speaking out against the Board's alleged abuses, or for any other unlawful reason. Absent such retaliation, Plaintiff fails to establish the extreme or outrageous conduct necessary for intentional infliction of emotional distress to be actionable. *See Cokus v. Bristol Myers Squibb Co.*, 362 N.J. Super. 366, 391 (Law Div. 2002) (rejecting the plaintiff's emotional distress claim even if "the conduct in question was not in retaliation for plaintiff's whistleblowing activities" and thus not subject to CEPA's waiver provision).

To allege a violation of public policy for a wrongful discharge, a plaintiff must "prove not only that he or she complained about a public policy, but that his or her resulting discharge violated a clear mandate of public policy." *Tartaglia*, 197 N.J. at 112. *Pierce v. Ortho Pharmaceutical*

---

the CEPA claim and its underlying facts or activities. *Young*, 141 N.J. at 29 ("[T]he waiver provision applies only to those causes of action that require a finding of retaliatory conduct that is actionable under CEPA."). A cause of action is substantially independent of CEPA, and hence not subject to the waiver provision, if it "requires different proofs from those required to sustain a CEPA claim." *Ivan v. County of Middlesex*, 595 F. Supp. 2d 425, 465 (D.N.J. 2009). Or, in other words, "[t]he causes of action that fall within [CEPA's] waiver provision are those causes of action that are directly related to the employee's termination due to [retaliation]." *Young v. Schering Corp.*, 275 N.J. Super. 221, 238 (App. Div. 1994)), *aff'd*, 141 N.J. 16 (dismissing claims for intentional infliction of emotional stress and discharge in violation of public policy under the waiver provision); *Tartaglia v. UBS PaineWebber, Inc.*, 197 N.J. 81, 103 (2008) (explaining that, by pursuing a CEPA claim, a plaintiff waives any alternative remedy that would otherwise be available for the same retaliatory conduct, although not at the expense of pursuing *other* causes of action that are *substantially independent* of the CEPA claim); *see also Battaglia v. United Parcel Service, Inc.*, 214 N.J. 518, 556 n.9 (2013) (citing *Tartaglia*).

*Corp.*, 84 N.J. 58, 71-73 (1980), established this common law cause of action, which in turn gave rise to the CEPA statute codifying New Jersey's protections against wrongful discharge. "[A]n action pursuant to CEPA [now] precludes a plaintiff from bringing a common law action against his employer for retaliatory conduct under *Pierce*," *Moore v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, No. 90-1182, 1990 WL 105765, at *2 (D.N.J. July 16, 1990), unless a plaintiff demonstrates that her *Pierce* claim depends on different facts and proof than her CEPA claim. *See, e.g.*, *Bosshard v. Hackensack Univ. Med. Ctr.*, 345 N.J. Super. 78, 90 (App. Div. 2001); *Myers v. Advanced Stores Co. Inc.*, No. 19-18183, 2020 WL 2744632, at *6 (D.N.J. May 27, 2020).

Defendants correctly point out that Plaintiff has not alleged much difference, if any, between her CEPA claim in Count One and her *Pierce* claim in Count Seven. For example, Plaintiff states in her Complaint that Defendants "terminat[ed] her" as the "direct result of her objections to what she reasonably believed were [ ] unlawful practices," which constituted a "violation of clear mandated public policies within the State." Compl., at 33-34 ¶¶ 194-96. Such facts, conduct, and proof are identical to those which support her CEPA claim. In that regard, Plaintiff's *Pierce* claim in Count Seven is similarly barred by collateral estoppel. The arbitrator not only found no evidence that Plaintiff spoke out against a public policy, but concluded that Defendants lawfully terminated Plaintiff without engaging in any retaliatory behavior. A lawful termination, as here, cannot underlie a wrongful discharge claim. Accordingly, Counts Seven and Eight are precluded, in short, because they are premised on allegations, facts, and conduct which the arbitrator expressly rejected.

### 4.   Count Five – New Jersey Law Against Discrimination

I also find that Plaintiff's claim under the New Jersey Law Against Discrimination ("LAD") in Court Five is precluded. The LAD was enacted in 1945 to eradicate discrimination.

*See Everson v. JPMorgan Chase Bank*, No. 12-07288, 2013 WL 1934666, at *2 (D.N.J. May 8, 2013); *Shaner v. Horizon Bancorp.*, 116 N.J. 433, 436 (1989) (explaining that the LAD reflects "the clear public policy of this State . . . to abolish discrimination in the work place."). New Jersey courts rely on federal courts and their construction of federal antidiscrimination laws to interpret the LAD, including the "burden-shifting paradigm" set forth in *McDonnell Douglas* under which the plaintiff has the duty to establish a *prima facie* case of unlawful treatment. *Victor v. State*, 203 N.J. 383, 398, 408 (2010); *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 200 (1999) ("To the extent the federal standards are 'useful and fair,' they will be applied in the interest of achieving a degree of uniformity in the discrimination laws.") (quotation omitted); *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 606-07 (1993) (depending on the United States Supreme Court's interpretation of Title VII); *Grigoletti v. Ortho Pharm. Corp.,* 118 N.J. 89, 97 (1990) ("In a variety of contexts involving allegations of unlawful discrimination, this Court has looked to federal law as a key source of interpretive authority."). "There is no single prima facie case that applies to all employment discrimination claims" under the LAD, because "the elements of the prima facie case vary depending upon the particular cause of action." *Victor*, 203 N.J. at 408. Even so, consistent with federal law, "[a]ll employment discrimination claims [in New Jersey] require the plaintiff to bear the burden of proving the elements of a prima facie case" regardless of the nature of the claim. *Id.*

Here, Plaintiff brings a retaliation claim. "The LAD-based claim for retaliation is similar but not identical to the statutory claim for retaliation created in CEPA. *See Tartaglia*, 197 N.J. at 104-06) (describing CEPA's elements). To make out a *prima facie* case of retaliation under the LAD, Plaintiff must demonstrate that: "(1) [she] was in a protected class; (2) [she] engaged in protected activity known to the employer; (3) [she] was thereafter subjected to an adverse

employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence." *Victor*, 203 N.J. at 409 (citing *Woods-Pirozzi v. Nabisco Foods,* 290 N.J. Super. 252, 274 (App. Div. 1996)). Despite the fact that "the prima facie case [is] unique to th[is] particular discrimination claim," *Victor*, 203 N.J. at 410, at bottom, all LAD-based discrimination claims "share . . . the requirement that plaintiff endure an adverse employment consequence as a result of [a] discriminatory act." *Id.* In view of these pleading requirements, Plaintiff's LAD claim is clearly precluded by issues decided by the arbitrator. Indeed, the arbitrator concluded that Plaintiff was fired for lawful reasons, not for engaging in protected activity, which defeats the causal link between her termination and her protected activity (assuming she engaged in any). To that extent, the arbitrator's decision forecloses Plaintiff's LAD-based retaliation claim.

5.   Counts Three and Four – Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing

This leaves Plaintiff's breach of contract claim in Count Three and breach of good faith and fair dealing claim in Count Four, which Defendants suggest are also barred by CEPA's waiver provision. Counts Three and Four are predicated on the existence of an express or implied employment agreement. Although Plaintiff references such an agreement in her Complaint, *see* Compl., at 7 ¶¶ 23-24, 29, 162-64, she neither attaches it to her Complaint nor quotes the breached provisions, and thus, the Court cannot assess the substance of these contractual claims. Plaintiff merely alleges, without support, that Defendants violated her "written employment contract" by "terminating her." *See* Compl., at 29 ¶ 165-68. Absent more specific factual averments as to the parties' agreement and the nature of the alleged breach, the Court is unable to determine whether the allegations in Counts Three and Four "go beyond the theory of retaliatory discharge," *Hornung v. WeyerHaeuser Co. Inc.*, No. 06-2300, 2007 WL 2769646, at *5 (D.N.J. Sept. 21, 2007), and "concern[] collateral issues, which would not be a violation of CEPA even if proven," *Flaherty*,

255 N.J. Super. at 413, or whether they are coextensive with CEPA and waived to that extent. Indeed, some contractual causes of action are plainly "independent of [a] retaliatory discharge claim" under the CEPA and not subject to its waiver provision. *Young*, 141 N.J. at 31; *Boyle v. Quest Diagnostics, Inc.*, 441 F. Supp. 2d 665, 671 (D.N.J. 2006). In short, then, I cannot determine whether the claims in Counts Three and Four are "substantially independent" of the CEPA claim, *Young*, 141 N.J. at 29, *i.e.*, "require different proofs" than retaliation, *Ivan v. County of Middlesex*, 595 F. Supp. 2d 425, 465 (D.N.J. 2009), or whether they "require a finding of retaliatory conduct that is actionable under," and thus barred by, the CEPA. *Young*, 141 N.J. at 29 ("[W]e are thoroughly convinced the Legislature did not intend to penalize former employees by forcing them to choose between a CEPA claim and other legitimate claims that are substantially, if not totally, independent of the retaliatory discharge claim.").

More importantly, because of the dearth of allegations regarding the employment agreement, I also cannot determine whether collateral estoppel would bar Counts Three and Four by defeating an element of Plaintiff's *prima facie* case of breach. While Defendants also move to dismiss these two claims under Rule 12(b)(6), because all of the federal causes of action are dismissed and there is no diversity between the parties, I decline to exercise supplemental jurisdiction over these state-law claims. *See* 28 U.S.C. § 1367. Pursuant to § 1367(d), the breach of contract and breach of the implied covenant of good faith and fair dealing claims are dismissed without prejudice, and any applicable statute of limitations is tolled for thirty days, such that Plaintiff may refile these claims in state court.

## IV.    CONCLUSION

For the foregoing reasons, I find that *Rooker-Feldman* does not deprive this Court of subject matter jurisdiction; collateral estoppel bars Plaintiff's First Amendment, Equal Protection,

public policy, LAD, and emotional distress claims; and Plaintiff fails to plead a plausible due process violation. I decline to exercise supplemental jurisdiction over Plaintiff's breach of contract, good faith and fair dealing claims in Counts Three and Four, dismiss them without prejudice, and toll the statute of limitations pursuant to § 1367(d), so that Plaintiff may refile in state court within thirty days from the date of the Order accompanying this Opinion. Accordingly, Defendants' Motion to Dismiss is **GRANTED** in part and **DENIED** in part**.**


**DATED**:  December 14, 2020                                    /s/ Freda L.  Wolfson
                                                                                    Freda L.  Wolfson
                                                                                    U.S. Chief District Judge